UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

          -against-

LOUIS COLON-GENTILE,

                    Defendant.

------------------------------------------------------------------x

**MEMORANDUM & ORDER**

12-CR-777 (ENV)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAY 23 2014 ★

BROOKLYN OFFICE

VITALIANO, D.J.

      Defendant Louis Colon-Gentile is charged in a seven-count indictment with distribution, receipt, and possession of child pornography, in violation of Title 18, United States Code §§ 2252(a)(2), 2252(a)(4)(B), 2252(b)(1) and 2252(b)(2). Colon-Gentile has moved to suppress physical evidence and statements he made, on the ground that they were obtained in violation of the Fourth Amendment. See Docket Nos. 16, 28, 30. An evidentiary hearing was held on September 23, 2013. At the conclusion of the hearing, the Court directed the parties to file simultaneous post-hearing briefs. See Docket Nos. 26–30. Counsel were extended the opportunity to offer oral argument on March 28, 2014. For the reasons and upon the Court's findings of fact and conclusions of law that follow, defendant's motion to suppress is denied.

## Findings of Fact

At the evidentiary hearing, the Court heard testimony from Special Agent Thomas Thompson of the Federal Bureau of Investigation ("FBI"), defendant's grandmother, Carmella Barchetta, and defendant. The Court finds the following facts.[1]

An investigation by the FBI into communications between two Yahoo users with the screen names "Jackn_wm" and "ready_2_snuff_u" revealed private chats during which both users expressed an interest in child pornography. Transcript of September 23, 2013 Suppression Hearing ("Tr."), at 5–6. Information obtained in response to subpoenas served on Yahoo and Verizon, along with information from law enforcement databases, indicated that the activity of user "ready_2_snuf_u" was originating from a single-family residence in Brooklyn, owed by Barchetta, where Colon-Gentile also resides. Tr. 6, 26, 50.

On the evening of November 6, 2012, between 8:00 and 9:00 P.M., Agent Thompson and his partner, FBI Special Agent Aaron Spiveck, went to the Barchetta residence to interview defendant about his online activities.[2] Tr. 7, 30. The agents

---

[1] The findings, of course, are based on the evidence, factoring in the demeanor of the witnesses and reconciliation of various testimony, that the Court finds credible. Where evidence has been offered that is at odds with the Court's finding, these conflicts are noted. The government's burden to establish the constitutional validity of the seizure and statements is by a preponderance. See United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006).

[2] The layout of the residence itself is not in material dispute. At the exterior front of the home, three front steps lead up to a small front stoop. There are then two doors leading to the interior of the residence, a storm door and a front door. Immediately inside these two doors is a foyer area, which is separated from the living room by an interior glass door. See Tr. 65.

stood on the front stoop, rang the doorbell and knocked on the door. Tr. 7, 51–52. When Barchetta came to the door and opened it, the agents stepped into a foyer area between the outside entrance and a glass door leading to the living room. Tr. 7. Agent Thompson testified that it was a cold night, so Barchetta was standing back from the front door, and he had to step into the foyer to show her his identification. Tr. 33. Now standing in the foyer, the agents told Barchetta that they wanted to interview Colon-Gentile because they believed he might be the victim of a computer crime. Tr. 7, 51–52. Agent Thompson stated that he did not tell Barchetta the real reason for their visit because he "didn't want to upset her." Tr. 8, 34–35. Barchetta told the agents to wait and went further into the house, shutting the interior glass door between the living room and the foyer. Tr. 8. A short time later, she came back with Colon-Gentile.[3] Id.

After the agents informed defendant that they wanted to speak with him about the Yahoo account "ready_2_snuff_u," Colon-Gentile told Barchetta that he wanted to speak to the agents privately.[4] Id. At that point, Barchetta stated that

---

[3] Barchetta's version of her initial interaction with the agents differs somewhat from Agent Thompson's testimony. Barchetta testified that the agents did not identify themselves or step into the foyer when she first came to the front door. Her recollection was that the agents identified themselves and stepped into the residence only after Colon-Gentile came to the front door. Tr. 51–52. Colon-Gentile also testified that the agents were standing outside the residence when he came to the door, but that Agent Thompson stepped inside as he was showing defendant his identification. Tr. 66–67. Whether the agents stepped into the residence when Barchetta first came to the door and opened it, or when Colon-Gentile did, there is no dispute that the agents stepped inside the Barchetta residence to display their credentials. See Tr. 51–52, 66–67, 82.

[4] Agent Thompson also testified that he leaned in toward defendant, put his arm on his shoulder, and said, "[Y]ou know this is about child pornography[?]" Tr. 39. The Court finds that this touching was not meant to be either a threatening or a restraining act. Colon-Gentile agreed that

3

she did not believe Agents Thompson and Spiveck were actually with the FBI, so Agent Thompson handed her his business card and told her to call his office to verify the agents' identities. Tr. 8–9. Barchetta went through the interior glass door into the living room. After a few minutes, Barchetta came back with a phone in her hand. Tr. 9. She said that she called the number on the card, but no one answered.[5] Id. Barchetta eventually told the agents that she was going to call the police. Tr. 10. She also stated that she wanted the agents out of her house.[6] Tr. 10, 35–36; see also Tr. 53. Agents Thompson and Spiveck "began to leave the house" when they were stopped by Colon-Gentile, who said "hold on . . . [l]et me get your business card, I'll call your office." Tr. 10. The agents had exited the house after being told to leave by Barchetta, and were now standing outside the house on the

---

Agent Thompson put his arm around him on the night of November 6th, but there is disagreement about the circumstances of that touching. Defendant recalled that Agent Thompson put his arm around him twice. First, Colon-Gentile stated that Agent Thompson put his arm around him and led him from the living room into the foyer of the Barchetta residence. Tr. 67. Barchetta testified similarly. See Tr. 52. Second, Colon-Gentile asserted that Agent Thompson put his arm on defendant's shoulder at the end of their interview, while Colon-Gentile and the agents were standing outside on the stoop, and asked defendant whether he was going to do anything stupid after the agents had left. Tr. 77. Again, the Court finds that the alleged touching does not rise to the level of a threatening or a restraining act.

[5] In the aftermath of Hurricane Sandy, the FBI office in downtown Manhattan was closed, and calls were being routed through FBI suboffices in White Plains, Queens and Long Island. Tr. 9. Agent Thompson explained to Barchetta that, as a result, there could be some issues getting through to someone, and she should try calling again. Id.

[6] Barchetta and Colon-Gentile testified that by the time Barchetta asked the agents to leave, at least one agent had stepped from the foyer into the living room. See Tr. 52, 67. The government does not dispute that both the foyer and living room are inside the Barchetta residence. Gov't Rep. 2 n. 2. Whether the agents were standing in the foyer or, slightly farther inside the residence, in the living room, is not material for the purposes of the Court's Fourth Amendment analysis.

front stoop.[7] Id. Colon-Gentile went back into the house to call the agents' office in order to verify their identities. Id.

While defendant was inside, Agent Thompson received a phone call from his office asking him to confirm that he and Agent Spiveck were at the Barchetta residence in Brooklyn, which he did.[8] Tr. 10–11. When Colon-Gentile returned, he opened the front and storm doors leading to the stoop where the agents were standing, and said, "I called your office. They verif[ied] who you guys are, but my grandma's still not letting you guys in." Tr. 11. Defendant asked whether they could do the interview outside the house, on the front stoop, and the agents agreed. Id.

Agent Thompson told Colon-Gentile that he was not under arrest, and was free to discontinue the interview at any time. Id.; see also Tr. 78. He also told him that the FBI's "number one goal in these types of cases is to find those people who are actually making [] child pornography and [that defendant's] cooperation could

---

[7] Both Barchetta and Colon-Gentile testified that the agents did not immediately leave the house when asked to do so by Barchetta. See Tr. 52–53, 67–68. Agent Thompson, however, credibly testified that he and his partner left the house when Barchetta told them to leave, but were stopped on the front stoop by defendant. Tr. 10. In fact, Agent Thompson's testimony that he and Agent Spiveck left the house when asked to do so by Barchetta is corroborated by certain portions of Colon-Gentile's testimony. For instance, Colon-Gentile stated that when the NYPD arrived at the Barchetta residence, he and the agents were outside, "in front of the house," which indicates that, at some point, the agents did, indeed, leave the residence as requested. Tr. 72; see also Tr. 83. Furthermore, neither defendant nor his grandmother testified that the agents said or did anything indicating that they objected to Barchetta's request or even remotely suggesting that they did not intend to comply. See Tr. 51–52, 67–71.

[8] It appears that in addition to calling the agents' office, Colon-Gentile also placed a call to 911. Tr. 70–71; Def. Ex. A. This was the second 911 call that originated from the Barchetta residence on the evening of November 6th. The first 911 call was placed by Barchetta. Tr. 10, 70–71; Def. Ex. A.

maybe help in this area."[9] Tr. 11. The agents then conducted an interview with Colon-Gentile in which he admitted that he was the user of the "ready_2_snuff_u" Yahoo account, and that he had traded child pornography. Tr. 12. Defendant also stated during the interview that he had child pornography on his desktop computer. Id. Agent Thompson asked Colon-Gentile if he would be willing to give consent for the agents to review his computer back at their office, and he agreed. Id.

During the agents' conversation with defendant, a NYPD patrol car showed up at the residence. Agent Spiveck went over to talk to the two officers who were in the car. Following that conversation, Agent Spiveck rejoined Agent Thompson and they continued interviewing Colon-Gentile. Id. At this point, Barchetta came out of the house, went over to the NYPD officers and "started yelling at them." Tr. 12–13; see also Tr. 53. Meanwhile, the interview of defendant by Agents Thompson and Spiveck continued. During the interview, Colon-Gentile said that he would go and get his computer.[10] Tr. 13.

Good to his word, Colon-Gentile went into the house, got his desktop computer, and brought it outside to the stoop where the agents were standing. Id.; see also Tr. 78, 83. The agents showed defendant a "Consent to Search Computer(s)" form (Gov't Ex. 4), and Agent Thompson explained that it would give

---

[9] Barchetta testified that she heard one of the agents tell Colon-Gentile that he was not in trouble, and that he just had to cooperate and everything would be fine. Tr. 52. Colon-Gentile stated that the agents told him he was not under arrest, and that he was not in any trouble. Tr. 78.

[10] Barchetta and Colon-Gentile both testified that Colon-Gentile felt he had no choice. Defendant alleged that Agent Thompson told him that he could either get the computer, or the agents would come in and take it. See Tr. 76, 78.

them written consent to search the computer. Tr. 13; see also Tr. 78. Agent Thompson stated that Colon-Gentile did not have to sign the form, but that his cooperation would be appreciated. Tr. 13; see also Tr. 16–17, 21. Colon-Gentile signed the "Consent to Search Computer(s)" form, as well as a "Consent to Assume Online Presence" form (Gov't Ex. 5) and an FBI property voucher. Tr. 17, 78. Colon-Gentile read and signed the forms without asking the agents any questions. Tr. 17. According to Agent Thompson, he did not appear to be upset, or mentally or physically disabled in any way. Tr. 17, 43. In fact, he appeared "calm" and was "cooperative" throughout his interaction with the agents. Tr. 43. The only time defendant appeared upset, according to Agent Thompson, was at the very end of the interview, after he had read and signed the documents, when he asked the agents whether they were going to arrest him. Id. On the totality of the evidence relating to his conduct and communications on that evening, the Court finds that Colon-Gentile was calm, aware and in control of himself throughout the interview process.[11] Agent Thompson told Colon-Gentile that he was not under arrest. Id.; see also Tr. 21, 78.

At the close of the front stoop interview, Agent Thompson stated that he and Agent Spiveck would take the computer back to FBI offices, review it, and write a report for the prosecutor, who would make a final decision about what would

---

[11] Colon-Gentile agreed with Agent Thompson that at a certain point, near the end of the interview, he got "really emotional." Tr. 77. However, he stated that this occurred before he went to get the computer from the basement. Id. Defendant and Barchetta also testified that he was upset and in shock throughout his interaction with the agents. Tr. 57–58, 68, 77.

happen. Tr. 17. Charges were later filed, and an arrest made. The motion seeks suppression of the evidence seized and of the statements made by the defendant on the night of the November 6, 2012 interview.

## Controlling Standards

A warrantless search or seizure without probable cause does not offend the Fourth Amendment "if the authorities have obtained the voluntary consent of a person authorized to grant such consent." United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995). "When the government seeks to justify a search on the basis of the subject's consent, and the subject is not in custody, the government must demonstrate that the consent 'was in fact voluntarily given, and not the result of duress or coercion, express or implied.'" United States v. Schaefer, 859 F. Supp. 2d 397, 406 (E.D.N.Y. 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)), aff'd, 519 F. App'x 71 (2d Cir. 2013). The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. See Bumper v. North Carolina, 391 U.S. 543, 548 (1968); United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006).

Whether consent was voluntary "is a question of fact determined by a totality of all the circumstances." United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) (citation and internal quotation marks omitted). The "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (citation and internal quotation marks omitted); see also Florida v. Jimeno, 500 U.S.

248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

In assessing the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation," courts have considered various factors. Schneckloth, 412 U.S. at 226. A court's analysis should reflect "careful scrutiny of all the surrounding circumstances," as opposed to "the presence or absence of a single controlling criterion." Id. Relevant factors include "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, [] the use of physical punishment such as deprivation of food or sleep . . . whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused consent." Schaefer, 859 F. Supp. 2d at 407 (citations and internal quotation marks omitted). The government has no affirmative obligation to advise the suspect of his right to refuse consent to search; rather, it is one factor to be taken into account in determining voluntariness. See United States v. Drayton, 536 U.S. 194, 206–07 (2002); United States v. Crespo, 834 F.2d 267, 271–72 (2d Cir. 1987).

## Conclusions of Law

## A. Colon-Gentile Voluntarily Consented To the Search and Seizure of His Computer

Measured against the relevant standards, and the findings of fact developed from the evidentiary hearing, the Court concludes that defendant's consent to the seizure and subsequent search of his computer was knowing and voluntary. In this case, Colon-Gentile stopped Agents Thompson and Spiveck as they were leaving the Barchetta residence and asked to speak with them outside on the front stoop; he agreed to the interview after being told by Agent Thompson that he was not under arrest and that he could discontinue the conversation at any time; unaccompanied by the agents, he retrieved his computer from inside the residence and brought it outside to the stoop where the agents had remained; and he read and signed consent forms that permitted law enforcement to search his desktop computer and to assume his online identity. With respect to other factors, furthermore, defendant is a 26-year-old native English speaker who graduated magna cum laude from college with a degree in business administration, the interview took place at his home between 8:00 and 9:00 PM, he appeared calm and was cooperative throughout, and the agents never placed him under arrest, handcuffed him, drew their weapons, or threatened physical harm of any kind toward him or his grandmother.[12] Tr. 79, 80, 86–87; see also Schaefer, 859 F. Supp. 2d at 406–407.

---

[12] Agent Thompson, during a huddle with Colon-Gentile to communicate the reason for the agents' presence outside the hearing of Barchetta, did place his arm around defendant's shoulder. Tr. 39. As noted earlier, this contact was, the Court finds, neither restraining nor threatening.

Nevertheless, Colon-Gentile asserts that his consent was not voluntary because: (1) the agents misled him into believing he was not in trouble; (2) he felt he had to consent due to the agents' threat to tell his grandmother that he was involved in child pornography, coupled with his concern for his grandmother's health; and (3) he believed he had no choice but to consent because the agents told him they had a subpoena.

### 1) Agent Thompson Did Not Mislead Colon-Gentile

Agent Thompson credibly testified that he told Colon-Gentile, truthfully, that his top priority was catching those responsible for making child pornography. Tr. 11. The defense argues that "[c]ourts have categorically rejected 'consent' obtained by exploiting a citizen's civic desire to assist law enforcement for the express purpose of incriminating that citizen." Def. Mem. 32. As the government points out, however, this case is readily distinguishable from the cases cited by defendant, in which law enforcement agents gained entry to a defendant's premises, or enticed a defendant to cooperate, through false pretenses. See Def. Mem. 32–33; Gov. Mem. 13. For example, where consent to search a computer is obtained by government agents falsely representing that they suspected that the computer user was the victim of a computer scam and that they sought access to investigate that crime. United States v. Parson, 599 F. Supp. 2d 592 (W.D. Pa. 2009). Here, there were no false pretenses; rather, Agent Thompson honestly communicated his investigatory priorities to the defendant. Critically, the agents said nothing to suggest that this priority was the only subject of their investigation. C.f. Parson, 599 F. Supp. 2d at

11

602–03; see also United States v. Pollaro, 733 F. Supp. 2d 364, 368–69 (E.D.N.Y.

2010) (noting that misrepresentation of investigatory purpose must be "extreme" to

render consent invalid). Nor, despite advising Colon-Gentile that he was not in

trouble, did the agents ever state or suggest that the investigation they would

conduct could never lead to criminal charges being lodged against him. That this

message was fairly communicated is amply corroborated by Colon-Gentile's

question to the agents at the end of the interview about whether they were going to

arrest him. Tr. 17. That question indicated quite plausibly that he knew all along

that he might, in fact, be in trouble, even though he himself had not been involved in

the production of child pornography.

### 2) Defendant's Concern for His Grandmother's Health Did Not Render his Consent Involuntary

The Court finds Colon-Gentile's testimony that the agents threatened to tell

his grandmother about his involvement in child pornography as a means of exerting

influence over him, simply, incredible. More than that, any concerns defendant may

have had about his grandmother's health do not render his consent involuntary

because they were never communicated by him to the agents, nor were they readily

apparent. See Isiofia, 370 F. 3d at 231; Jimeno, 500 U.S. at 251. To bolster his

claims, defendant testified, but never told the agents at the time, that he was worried

about his grandmother's health because she had a heart attack several years earlier,

and, as a result, he felt he had no choice but to consent to the seizure and search of

his computer. See Tr. 78. All of this is belied, of course, by the fact that the agents

were leaving the residence at Barchetta's request before any seizure or statement, and it was defendant who asked them not to leave. Tr. 10. On the totality of the circumstances, the agents had no basis to believe that the voluntariness of defendant's consent could have been impacted by his concern for his grandmother's heart. Neither does the Court. Isiofia, 370 F. 3d at 231.

### 3) Defendant's Consent Was Not Rendered Involuntary By Agent Thompson's Mention of a Subpoena

Finally, while Agent Thompson acknowledged that he may have mentioned a "subpoena" on the night of November 6th, that passing reference was immaterial to Colon-Gentile's consent. In response to a question from Barchetta about how the agents found her house, Agent Thompson explained that "the IP address [obtained] through a subpoena came back to [the Barchetta] residence." Tr. 20. Contrary to defendant's recollection, Agent Thompson also testified that neither he nor Agent Spiveck told Colon-Gentile that they possessed a subpoena, or any other legal process, that authorized them to question defendant, or to seize and search his computer, without his consent. Once again, Agent Thompson's version is corroborated by the evidence that the agents left the residence at Barchetta's request—something that they would be unlikely to do if they possessed a legal document that authorized them to be there.

Moreover, Colon-Gentile's own testimony made clear that Agent Thompson accurately explained the subpoena's limited scope. Specifically, Colon-Gentile testified that, when he asked Agent Thompson how the FBI obtained his screen

name, Agent Thompson said that it was obtained "through a subpoena." Tr. 68. When defendant asked Agent Thompson whether he himself was being subpoenaed, Agent Thompson responded, "[N]o, we subpoenaed Yahoo." Tr. 68–69. Thus, the mention of a subpoena in this context did not render defendant's consent "mere acquiescence in a show of authority." United States v. Wilson, 11 F. 3d 346, 351 (2d Cir. 1993); c.f. United States v. Brodie, 250 F. Supp. 2d 462 (E.D. Pa. 2002) (defendant's consent was not voluntary when he only handed over evidence because he was told by a government agent that a subpoena was "in the works," where the agent did not have a subpoena and did not know whether he could actually get one). Lastly, on this point, the "Consent to Search Computer(s)" form and the "Consent to Assume Online Presence" form, which were read and signed by defendant, explicitly stated that he had the right to refuse consent, and that he was voluntarily waiving that right. See Gov't Ex. 4–5. In sum, based on the totality of the circumstances, the Court concludes that Colon-Gentile's consent to the seizure and search of his computer was voluntary.

B. The Search of Defendant's Computer Did Not Exceed the Scope of His Consent

Colon-Gentile argues that, even if his consent to the search of his computer was voluntary, it extended only to a search for information relevant to the identification and prosecution of those involved in making child pornography.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness—what [] the typical reasonable person [would] have understood by the exchange between the officer and

the suspect[.]" <u>Winfield v. Trottier</u>, 710 F.3d 49, 53 (2d Cir. 2013) (quoting <u>Jimeno</u>, 500 U.S. at 251) (internal quotation marks omitted).

Here, although Agent Thompson told defendant that his top priority was finding people suspected of producing child pornography, neither of the agents informed Colon-Gentile that their investigation was limited to such suspects, or that, if, in the course of such a search, evidence of other crimes was unearthed, that such evidence would be overlooked. Indeed, and powerfully, the "Consent to Search Computer(s)" form, read and signed by defendant, provides consent to search defendant's desktop computer "for <u>any</u> evidence of a crime or other violation of the law." Gov't Ex. 4 (emphasis added). Similarly, the "Consent to Assume Online Presence" form authorized the use of defendant's online presence "for <u>any purpose</u> relating to an official investigation by the [FBI], including (but not limited to) sending and receiving e-mail or conducting any other electronic communications, accessing stored information, and using and disclosing such communications or information." Gov't Ex. 5 (emphasis added). As a consequence, the search of defendant's computer and discovery of child pornography fell well within the scope of the consent provided by Colon-Gentile. Any limitation he thought might apply is, clearly, <u>post hoc</u>.

## C. The Agents' Entry Into the Barchetta Residence Does Not Warrant Suppression of Defendant's Statements or Physical Evidence

Colon-Gentile asserts that the seizure and statements he made were necessarily tainted, and should be suppressed, because of the agents' initial illegal

entry into the Barchetta residence.[13] The government contends that the brief entry was not illegal, and, even if it was, any taint from the illegal entry had dissipated by the time Colon-Gentile (1) agreed to speak with the agents, and (2) consented to the seizure and search of his computer.

Defendant would not fare any better even if the Court concluded that the agents had initially entered the Barchetta residence illegally. When consent follows an illegal entry, the government must "show more than the voluntariness of the consent; it must also demonstrate that 'the taint of the initial entry has been dissipated' in order to admit evidence seized following the illegal entry." Snype, 441 F. 3d at 132 (2d Cir. 2006) (quoting United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990)). There are three factors relevant to this inquiry when, as here, the person giving consent is not in custody: (1) "the temporal proximity of the illegal entry and the alleged consent," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." Kaupp v. Texas, 538 U.S. 626, 633 (2003); Snype, 441 F.3d at 134–35.

---

[13] There is somewhat of a factual dispute about the agents' initial entry into the Barchetta home. Defendant and his grandmother both testified that Agent Thompson entered the foyer and living room of the Barchetta residence without consent. Agent Thompson testified that he and Agent Spiveck briefly entered the foyer, but left immediately when asked to do so by Barchetta. There is no dispute that a glass door separated the living room and the foyer, and, that the door was opened to facilitate the communication between the residents and the agents. Finally, and most importantly, it is of no moment whether, during this verbal communication, Agent Thompson stepped over the boundary line between the foyer and the living room. The evidence is compelling in its totality that the agents did not barge into the Barchetta residence but, instead, sought permission to enter, which was granted. It is irrelevant that they may have stepped in farther than Barchetta or defendant would have liked. What is important, and it speaks volumes about this verbal contact, is that when Barchetta withdrew permission and asked the agents to leave, they left. The only thing that halted their departure was Colon-Gentile waylaying them on the stoop and asking them not to leave.

The record convincingly demonstrates that any taint from the initial entry had dissipated by the time Colon-Gentile agreed to speak to Agents Thompson and Spiveck and consented to the seizure of his desktop computer. With respect to temporal proximity, the short lapse of time between the entry and consent did little to dissipate any taint of illegality. Within this short period of time, however, much occurred: the agents were asked to leave the residence by Barchetta and did so; they were stopped on the front stoop by Colon-Gentile, who asked them to wait while he verified their identities; the agents waited outside while Colon-Gentile went into the house and called FBI headquarters as well as the police; the agents interviewed Colon-Gentile only after he came back outside, joined them on the front stoop and asked them whether they could conduct the interview there; the agents advised Colon-Gentile that he was not under arrest and could terminate the interview at any time; at the end of the interview, Colon-Gentile went into the house alone to retrieve his computer and brought it outside to the agents; and before taking custody of the computer, the agents gave Colon-Gentile two consent forms, which he read and signed. The Second Circuit has recognized that such "intervening events, even within a brief time, can sometimes sever the causal connection between an illegal entry and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will." Snype, 441 F.3d at 134 (citing Oguns, 921 F.2d at 447–48). This, like Snype and Oguns, is such a case.

Turning to the third and final factor, the agents' conduct, assuming, arguendo, that it was illegal, was not flagrantly illegal or fraught with evil purpose. The agents stepped into the Barchetta residence in an effort to identify themselves, and then waited there while Barchetta went to get Colon-Gentile from the basement. More importantly, as soon as Barchetta asked them to leave, they did. Nothing in the record indicates that their actions were taken in bad faith, were malicious, or were intended to disregard anyone's right to be serene in his home.

Thus, the government has satisfied its burden of showing that the taint of any illegal entry dissipated before Colon-Gentile agreed to talk to the agents and consented to the seizure and search of his computer.

### Conclusion

For all of the foregoing reasons, Colon-Gentile's motion to suppress the seizure of his computer and its contents along with statements he made in connection with the seizure is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
     May 15, 2014

s/Eric N. Vitaliano

**ERIC N. VITALIANO**
**United States District Judge**